# EXHIBIT 10

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF KINGS

MENACHEM LICHTER,

Plaintiff,

-against –

SHULEM OBERLANDER a/k/a SOLOMON OBERLANDER a/k/a SALAMON OBERLANDER; HOROWITZ & RUBENSTEIN, LLC; ELI ALAN RUBENSTEIN a/k/a ALAN RUBENSTEIN; STEVEN HOROWITZ and JACOB GINSBURG,

Defendants.

INDEX NO. XXXXXXXX

**VERIFIED COMPLAINT**

**COMES NOW** the Plaintiff, MENACHEM LICHTER ("Plaintiff" or "Lichter"), by way of his attorney, Scott C. Levenson, Esq., of Levenson Law Group, complaining of the Defendants as named above, respectively shows to this Court and alleges as follows:

## I. PRELIMINARY STATEMENT

1. This is a plenary action against Defendants SHULEM OBERLANDER a/k/a SOLOMON OBERLANDER a/k/a SALAMON OBERLANDER; HOROWITZ & RUBENSTEIN, LLC (the "Law Firm"); ELI ALAN RUBENSTEIN a/k/a ALAN RUBENSTEIN; JACOB GINSBURG and STEVEN HOROWITZ (collectively, "Defendants") for fraud, fraudulent inducement, and breach of contract, and several other claims.

2. Defendants, acting together and individually, perpetrated fraud in an attempt to recoup monetary losses unrelated to the valid and binding insurance policies and loan agreement executed by Shulem Oberlander. Despite the egregious and fraudulent actions taken by Defendants, these types of actions were not a first for the Law Firm, Rubenstein, Ginsburg and

Horowitz (collectively, "Law Firm Defendants"), and in fact, seem to be a pattern of conduct. *See* U.S. Life Ins. Co. v. Horowitz, 2020 N.Y. Slip Op. 32445 (N.Y. Sup. Ct. 2020) (New York County Supreme Court, Index No. 650221/2019). Attached hereto as **Exhibit A** is a true and correct copy of the Decision in U.S. Life Ins. Co. v. Horowitz, 2020 N.Y. Slip Op. 32445 (N.Y. Sup. Ct. 2020).

3. Now, Law Firm Defendants being caught in such an act again with a new fraudster/co-conspirator, Oberlander, Plaintiff files this action seeking monetary relief in an amount of more than $1 million against Defendants for their egregious conduct.

## II. THE PARTIES, JURISDICTION, and VENUE

4. Plaintiff MENACHEM LICHTER is a natural individual residing in Rockland County, New York. Lichter was an insurance broker for Mass Mutual Insurance; he negotiated and provided the life insurance policies to Defendant Oberlander.

5. Defendant SHULEM OBERLANDER a/k/a SOLOMON OBERLANDER a/k/a SALAMON OBERLANDER ("Oberlander") is a natural individual residing in Kings County, New York. Oberlander is a 50% non-active owner in his family business, J&J Farms Creamery, and owner of at least four properties located in Brooklyn and the Bronx. Oberlander sought out life insurance policies on his mother, Pearl Oberlander.

6. Defendant HOROWITZ & RUBENSTEIN, LLC (the "Law Firm") is a limited liability company duly organized under the laws of New York with a principal place of business in Garden City, New York. The Law Firm is the firm that represents and represented Oberlander in the subject life insurance policy transactions. Horowitz and Rubenstein are the co-managing partners of the Law Firm.

7. Defendant ELI ALAN RUBENSTEIN a/k/a ALAN RUBENSTEIN ("Rubenstein") is a natural individual and attorney, residing in Nassau County, New York.

Rubenstein is and was Oberlander's attorney, directly representing him in executing and fraudulently revoking the subject insurance policies.

8. Defendant STEVEN HOROWITZ ("Horowitz") is a natural individual and attorney, residing in Nassau County, New York. Horowitz is and was Oberlander's attorney, directly representing him in executing and fraudulently revoking the subject insurance policies.

9. Defendant JACOB GINSBURG ("Ginsburg") is a natural individual and attorney, residing in Rockland County, New York. Ginsburg is and was Oberlander's attorney, directly representing him in executing and fraudulently revoking the subject insurance policies.

10. Jurisdiction is proper pursuant to CPLR 301, 302(a)(2), and 302(a)(3).

11. Venue is proper pursuant to CPLR 503.

## III. STATEMENT OF FACTS

12. This is an action brought by Plaintiff on the basis of fraud.

13. In or around Summer 2014, Oberlander contacted Lichter about obtaining a life insurance policy on his mother, Pearl Oberlander.

14. As he sought a large death benefit, Lichter informed Oberlander that a premium for such a life insurance policy would be very expensive and Oberlander would probably need financing.

15. Upon information and belief, Oberlander's attorney, Rubenstein recommended that he obtain a $45 million life insurance policy coverage on Oberlander's mother (approx. $15 million for each family member who was not actively involved in the family business, J&J Farms Creamery).

16. Due to his mother's older age (approx. 78), Lichter informed Oberlander that the coverage would likely need to be split with a few insurance carriers, as one insurance carrier ensuring an individual of that age is not likely.

17. Oberlander informed Lichter that because he is involved in a lot of business dealings and constantly investing, he would rather not pay the premiums out of pocket, but would prefer that Lichter find him a bank that would fund his premium. That way, Oberlander's money would not be tied up while paying for the premiums on the insurance policies.

18. Oberlander provided a PFS for his and his mother's assets. His mother's PFS showed a value of over $90 million in total assets, in addition to over $2 million of liquid cash sitting in her Chase Bank accounts. Attached hereto as **Exhibit B and C** are Letters dated April 10, 2014 and September 15, 2014, respectively, from Law Firm Defendants to Lichter Confirming Oberlander and Ms. Oberlander's Finances.

19. Oberlander further showed Lichter documentation of Oberlander's multiple insurance policies that he owned with a cash value of close to $1 million with death benefits of approximately $10-15 million. He also shared his Real Estate portfolio of various buildings that included shares and partnerships in private real estate holdings worth approximately $15-20 million.

20. He confirmed that he is a 50% non-active partner in his family business called J&J Farms Creamery located in Maspeth, NY, which at the time was making gross sales of $180 million, and had a market value of millions of dollars.

21. Based on all of the foregoing, Oberlander assured Lichter that he had the financial means to support these life insurance policies and their premiums. He further stated that his mother owned properties in NY and FL with no mortgages that are available as collateral if necessary.

Attached hereto as **Exhibit D** is a Letter dated March 12, 2015 from Law Firm Defendants to Lichter Confirming Oberlander and Ms. Oberlander's Finances for the Loan.

22. Oberlander agreed to provide his mother's house at 171 Hewes St., Brooklyn, NY as collateral to the bank that would be funding his policies. He then confirmed to Lichter that his mother agreed to provide her Brooklyn apartment as collateral in order for the family to get the loan to finance the policy.

23. Lichter met with Oberlander's mother, Pearl Oberlander at her house at 171 Hews St. in Brooklyn, NY, and she confirmed that she agreed to collateralized her house in order for the children to obtain a life insurance policy on her life.

24. Thereafter, Lichter began working on obtaining the policy for Oberlander.

25. Ms. Oberlander performed a medical exam and two interviews with the insurance companies as part of the underwriting process for the policies.

26. Lichter's senior colleague, Marc Allyn Frolich in Boca Raton, FL assisted Lichter in the transactions, as he was a senior agent with several years of experience with premium financing. Frolich and Lichter agreed to split the subject policy commissions 50/50.

27. Lichter's name was added to the Symetra policy as 50/50, however, not the AIG policy—as Lichter was not encouraged to sell AIG products by his employer, Mass Mutual. Instead, the AIG application went under Frolich's name, as he was authorized to sell AIG products. Frolich agreed to provide Lichter with half of the AIG policy commission.

28. During the process, Oberlander provided Lichter with his and his mother's financial statements, which were provided by Rubenstein.

29. Eager to finalize the policy, Oberlander called Lichter every couple of days checking on the status of the approval.

30. After a few months, Symetra and AIG provided their approval of the policies, despite Ms. Oberlander's old age and poor health. Several prior carriers declined her coverage. Each approved policy had a death benefit of $15 million and each with an annual premium of approximately $1 million.

31. In order to make sure the offer of coverage would not expire, Oberlander began paying the two policies on a monthly basis untill the bank would finalize the financial underwriting to secure the loan to fund the policies. His attorney, Rubeinstein created two family trusts so each policy will be owned by a separate trust. Attached hereto as **Exhibit E** is a copy of the Trust Documents.

32. Meanwhile, Oberlander, upon information and belief, made a large investment with an oil company and was waiting for the return of that investment to come back to him. He then decided to double his investments with the oil company, and to invest an additional million dollars of his money. He was told by the oil company that he would be earning 40% return on his money within a few months and he was extremely excited about his successes (eventually he ended up suing the entity where he made the investment).

33. As Oberlander continued to pay the monthly premiums, Lichter obtained the term sheet from Capital Source Bank for funding both policies and collateralizing Ms. Oberlander's Brooklyn apartment. The term sheet was signed by Oberlander and his brother, Baruch Oberlander in April 2017. Attached hereto as **Exhibit F** is true and correct copy of the Loan Documents.

34. As Lichter was working to finalize Oberlander's loan for funding, Lichter received a call from Leon Eisner to meet to discuss the Oberlander policies.

35. Upon meeting, Oberlander, Rubenstein, and Rubenstein's business partner, Steven Horowitz were there.

36. Lichter was informed by the Defendants that Oberlander would not proceed with the bank loan despite signing the term sheet. Defendants then accused Plaintiff of forging Oberlander and his mother's signatures on the insurance and bank applications. Attached hereto as **Exhibit H** is a true and correct copy of a Letter dated April 15, 2017 from Rubenstein to Eisner Furthering the False Fraud Claims.

37. Defendants threatened Plaintiff with filing a criminal lawsuit with the District Attorney's office unless Lichter would return the premium payments already paid into the policy within a two-week deadline.

38. Defendants continued to threaten Lichter, asserting they were preparing a criminal lawsuit with multiple counts against him and threatening jail time for financial fraud. They also threated to smear his reputation in the media and his community, and forcing him to lose his career.

39. Lichter then immediately hired a criminal attorney, to whom he paid a $25,000 retainer, plus additional attorney fees. Lichter's attorneys were Jack Laufer and Shulamis Peltz.

40. Lichter's criminal attorneys questioned Defendant attorneys how they could file such a case when they were the attorneys involved in preparing Oberlander's finances (determining need for insurance, creating the financial statements, creating the trusts, etc.) for the subject insurance policies.

41. In February 2016, Oberlander borrowed $100,000 from Lichter, promising to repay him in a couple months. Lichter agreed and wrote Oberlander a check from his TD Bank account in said amount.

42. Then, in the late summer of 2016, Lichter ran into Leon Eisner in the hallway of NYU Medical Center. Upon speaking, Eisner then wanted to help Lichter with the case, and make sure Oberlander would not be proceeding with criminal charges against Lichter.

43. After a several long and painful months and thousands of dollars in legal fees (over $100,000 that Lichter had to pay to Eisner), Oberlander agreed not to file legal charges against Lichter under the condition that Lichter would sell Oberlander's policy to someone else and make Oberlander whole on what he already invested in the policy. Lichter was able to find a buyer for the Symetra policy and the buyer took over the policy, paying Oberlander what he already invested in the policy.

44. The AIG policy eventually collapsed.

45. Later, Lichter found out the real reason for the false accusations against him: Oberlander had lost approximately $2 million in his oil investments and wanted to recoup some of his losses somehow.

46. Thereafter, Oberlander filed a lawsuit against the people who took money from him for the oil investment after it turned out to be nothing less then a fraud scheme.

47. Eventually on January 12, 2018, Lichter received an email from Oberlander stating that all insurance and loan documents were in fact genuine ("I confirm the content & the signing of Solomonoberlander, Bernard Oberlander , Pearl Oberlander for the above mentioned items is authentic, true & genuine…I hope this puts to rest all outstanding issues."). Attached here to as **Exhibit H** is a true and correct copy of the January 12, 2018 Email.

48. Based on all of the foregoing, Plaintiff now institutes this action in this proper venue seeking relief in the form of compensatory damages, punitive damages, and attorneys' fees.

## IV. CAUSES OF ACTION

### AS AND FOR A FIRST CAUSE OF ACTION

### FRAUD / FRAUDULENT INDUCEMENT

**(against all Defendants)**

49. Plaintiff fully realleges and incorporates the allegations in the preceding paragraphs as though fully alleged herein.

50. Defendants deceitfully represented that the subject insurance policies documents and loan documents were forged and falsified by Lichter.

51. As evidenced by the whole underwriting process and as well as the January 12, 2018 Letter from Oberlander, such representations were false.

52. These representations were material representations, threatening to be used against Lichter in criminal charges against him as well as tarnishing Lichter's reputation and career. They were also used to extort Lichter into selling Oberlander's insurance policies.

53. Defendants were well-aware that such representations were false.

54. Despite same, Defendants intended such false representations to extort Lichter and force him to act upon them by returning Oberlander's premium money to him.

55. Due to Defendants' fraudulent revocation of the insurance policies, Lichter lost his commissions therefor, suffered money damages in preparing for the threatened criminal suit against him, and suffered damages to his reputation and career.

56. As a result, Plaintiff has been damaged and seeks compensatory and punitive damages and attorney's fees of not less than $1 million.

**<u>AS AND FOR A SECOND CAUSE OF ACTION</u>**

**BREACH OF CONTRACT**

**(against Shulem Oberlander)**

57. Plaintiff fully incorporates by reference the preceding paragraphs.

58. In February 2016, Oberlander and Lichter entered into a contract by virtue of a check issued to Oberlander in which Lichter loaned Oberlander $100,000 to be paid back after a few months.

59. Lichter loaned Oberlander $100,000 by way of check from his TD Bank account.

60. Oberlander has failed to repay Lichter.

61. As a result, Lichter has suffered monetary damage in the amount of $100,000 plus interest.

**AS AND FOR A THIRD CAUSE OF ACTION**

**N.Y. JUD. L. § 487**

**(against Law Firm, Rubenstein, and Horowitz)**

62. Plaintiff fully incorporates by reference the preceding paragraphs.

63. Section 487 of the New York Judiciary Law addresses "misconduct by attorneys." It provides that "[a]n attorney or counselor who . . . is guilty of any deceit or collusion, with intent to deceive the court or any party . . . [i]s guilty of a misdemeanor, and in addition to the punishment prescribed therefor by the penal law, he forfeits to the party injured treble damages, to be recovered in a civil action."

64. Horowitz, Rubenstein, Ginsburg and the Law Firm engaged in deceit and collusion and consented to deceit and collusion with the intent to deceive Plaintiff.

65. The deceit, collusion, and consent to same by Horowitz, Rubenstein, and the Law Firm caused damages to Plaintiff in an amount to be determined at trial but not less than $1 million.

66. Pursuant to N.Y. Jud. L § 487, Plaintiff is entitled to recover treble damages in connection with this conduct.

**AS AND FOR A FOURTH CAUSE OF ACTION**

**FRAUDULENT INDUCEMENT**

**(against all Defendants)**

67. Plaintiff fully incorporates by reference the preceding paragraphs.

68. Defendants knowingly either made, directed to be made, or conveyed false statements to Plaintiff, with the intention of inducing Plaintiff to return the monetary premiums back to Oberlander.

69. Plaintiff relied on these false statements/threats, which were material to Plaintiff's decision to hire a criminal defense attorney and sell Oberlander's insurance policies.

70. As a result of the material false statements on which Plaintiff reasonably relied, Plaintiff has been damaged in an amount to be determined at trial but not less than $1 million.

**AS AND FOR A FIFTH CAUSE OF ACTION**

**CIVIL CONSPIRACY TO COMMIT FRAUD**

**(against all Defendants)**

71. Plaintiff fully incorporates by reference the preceding paragraphs.

72. Defendants are liable for fraud against Plaintiff.

73. Defendants agreed that the fraud would be perpetrated against Plaintiff.

74. Each of the Defendants acted intentionally, in furtherance of their agreement. As a result of the fraud, Defendants' agreement to participate in the fraud, and their actual participation in same, Plaintiff has been damaged in an amount equal to no less than $1 million.

**AS AND FOR A SIXTH CAUSE OF ACTION**

**AIDING AND ABETTING FRAUD**

**(against all Law Firm, Rubenstein, Ginsburg and Horowitz)**

75. Plaintiff fully incorporates by reference the preceding paragraphs.

76. All Law Firm Defendants had actual knowledge of the fraud perpetrated against Plaintiff by Oberlander.

77. Law Firm substantially furthered the fraud by asserting such documents were falsified and forged and threatening Plaintiff of the claims that would be brought against him, should Plaintiff not return the premiums paid and/or sell the insurance policies. Oster v Kirschner, 77 AD3d 51 (1st Dept 2010).

78. At the very least, each of the Defendants provided substantial assistance to the commission of the fraud perpetrated against Plaintiff.

79. As a result, Plaintiff suffered damages in an amount of no less than $1 million.

**AS AND FOR A SEVENTH CAUSE OF ACTION**

**UNJUST ENRICHMENT**

**(against Shulem Oberlander)**

80. Plaintiff fully incorporates by reference the preceding paragraphs.

81. Defendant Oberlander was enriched from Plaintiff's loan of $100,000.

82. Plaintiff loaned the money expecting to be paid back in a few months' time.

83. In allowing Oberlander to keep the loaned money, Oberlander would be ujustly enriched at Plaintiff's expense.

84. It is against equity and good conscience to permit Defendant Oberlander to retain the loaned money.

85. As a result, Plaintiff has suffered damages in an amount of $100,000 plus interest.

**AS AND FOR AN EIGHTH CAUSE OF ACTION**

**INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS**

**(against all Defendants)**

86. Plaintiff fully incorporates by reference the preceding paragraphs.

87. The conduct of Defendants has been intentional, reckless, wanton, willful, malicious, and without regard to the drastic consequences to the Plaintiff.

88. At all times Defendants acted with the intent to cause emotional distress, which acts, upon information and belief, were part of a calculated conspiracy, to extort Plaintiff into repaying money to which Defendant Oberlander was not entitled.

89. Defendants continually harassed and threatened Plaintiff of jail time and a ruined reputation and career.

90. The acts of the Defendants were extreme and outrageous in that they were continuous, threatening, and reckless.

91. The acts of the Defendants were for the sole purpose of causing severe emotional distress to induce Plaintiff to pay money to Oberlander not owed and get Oberlander off the hook for his insurance policies. Attached hereto as **Exhibits I** and **J** are true and correct copies of Symetra Email Requesting Agent Statement from Lichter and Lichter's July 13, 2016 Letter Response, respectively. Attached hereto as **Exhibit K** is a true and correct copy of Agent Statement from Lichter to Symetra Regarding Fraud Allegations.

92. The continued harassment and reckless conduct of Defendants were the direct cause of Plaintiffs' emotional distress.

93. That as a direct result of Defendants' conduct, Plaintiff suffered severe emotional distress which manifested itself in the form of stress, anxiety, and difficulty performing normal activities, and sleeplessness.

94. That as a result, Defendants are liable to Plaintiff for the actual damages sustained as a direct and proximate result of such conduct.

95. That as a result, Plaintiff is entitled to compensatory and punitive damages in an amount sufficient to punish Defendants for their intentional and unreasonable conduct as well as to serve as a deterrent to other fraudsters to prevent the occurrence of such egregious conduct in the future.

**AS AND FOR A NINTH CAUSE OF ACTION**

**DEFAMATION/LIBEL**

**(against all Defendants)**

96. Plaintiff fully incorporates by reference the preceding paragraphs.

97. Defendants continually purported that the insurance policy documents and loan documents were forged and falsified.

98. Defendants intentionally communicated and published these statements to numerous people in the Jewish community and insurance policy network, seeking to defame and destroy Plaintiff's reputation and career.

99. That as a direct result of Defendants' conduct, Plaintiff sustained a decrease in career success and unfavorable treatment in his community and among his career network, all of which were detrimental to Plaintiff. **Exhibit K**.

100. That as a result, Defendants are liable to Plaintiff for the actual damages sustained as a direct and proximate result of such conduct.

**AS AND FOR AN TENTH CAUSE OF ACTION**

**PUNITIVE DAMAGES**

**(against all Defendants)**

101. Plaintiff fully incorporates by reference the preceding paragraphs.

102. "Punitive damages differ conceptually from compensatory damages and are intended to address 'gross misbehavior' or conduct that 'wilfully [sic] and wantonly causes hurt . . . to another.'" Chauca v Abraham, 30 NY3d 325, 331 (2017) (citing Thoreson v Penthouse Int'l, 80 NY2d 490, 497, 606 NE2d 1369, 591 NYS2d 978 (1992)). "Punitive damages represent punishment for wrongful conduct that goes beyond mere negligence and are warranted only where aggravating factors demonstrate an additional level of wrongful conduct." Id. at 331-2.

103. Defendants unlawfully and intentionally committed fraud on Plaintiff, in addition to committing a conspiracy in executing same.

104. As a result of Defendants' actions, Plaintiff has no only suffered monetarily, but his reputation, career, and life within his community has been tarnished.

105. Defendant's actions constitute a willful, wrongful conduct which caused harm to Plaintiff.

106. As a result, Plaintiff has been damaged and punitive damages are warranted.

**AS AND FOR A ELEVENTH CAUSE OF ACTION**

**PAYMENT OF REASONABLE ATTORNEYS' FEES**

107. Plaintiff realleges the preceding paragraphs as if fully set forth herein and to the extent necessary.

108. Defendants' actions were willful and wantonly harmed Plaintiff.

109. As a result of Defendants' actions, Plaintiff was forced to initiate the within proceeding.

110. Plaintiff has a right to attorneys' fees and costs for having to initiate this action.

**WHEREFORE**, Plaintiff demands judgment in its favor and against Defendants (i) in an amount to be determined at trial, but in any event, no less than $1 million plus Plaintiff's costs, disbursements, and reasonable attorneys' fees both in this action and incurred connection the anticipated criminal action; ii) punitive damages; and (ii) for such other relief in Plaintiff's favor as this Court deems just and proper.

Dated: Nyack, NY
January 11, 2022

Yours, etc.
LEVENSON LAW GROUP

*<u>/s/ Scott Levenson</u>*
By: Scott Levenson, Esq.
Attorney for Plaintiff
9 North Mill Street
Nyack, NY 10960
(347) 352-2470
Levensonlawgroup@gmail.com

TO: E. Alan Rubenstein, Esq.
Steven A. Horowitz, Esq.
HOROWITZ AND RUBENSTEIN, LLC
200 South Service Road, Suite 104
Roslyn Heights, NY 11577

HOROWITZ AND RUBENSTEIN, LLC
200 South Service Road, Suite 104
Roslyn Heights, NY 11577
Attorneys for Shulem Oberlander

JACOB GINSBURG, ESQ
JACOB GINSBURG, ESQ PLLC
3 Concord Drive
Monsey, NY 10952

SHULEM OBERLANDER
1430 47th Street
Brooklyn NY 11219

**VERIFICATION**

STATE OF NEW YORK )
COUNTY OF ROCKLAND ) SS.:

I, MENACHEM LICHTER, being duly sworn, deposes and affirms, under the penalty of perjury as follows:

1. I am the individually-named Plaintiff in the within action.

2. I have read and reviewed the Verified Complaint and corresponding and attached exhibits, and know the contents thereof and verify that same is true to my own personal knowledge, except as to matters stated to be alleged upon information and belief, and as to those matter I believe to be true.

MENACHEM LICHTER

Sworn to before me this
11th day of January, 2022

Notary Public

GITTI KAHAN
Notary Public - State of New Jersey
My Commission Expires Sep 3, 2026





Scanned with CamScanner